[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties intermarried in Haddonfield, New Jersey on August 27, 1966. The defendant has resided in Connecticut for at least twelve months preceding the date of the filing of the complaint. The parties have two adult children.
The court has listened to and observed the witnesses and reviewed all the exhibits in the case. In addition, the court has carefully considered the criteria set forth in Connecticut General Statutes sections 46b-56, 46b-62, 46b-81, 46b-82, 46b-84 and46b-86(b) in reaching the decisions reflected in the orders that follow.
The court has also weighed the holding of the appellate court in O'Neill v. O'Neill, 13 Conn. App. 300, 311, cert. denied, 207 Conn. 806, (1988) wherein the court said as follows:
 A property division ought to accord value to those non-monetary contributions of one spouse which enable the other spouse to devote substantial effort to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities and primary care taking responsibilities. See also Blake v. Blake, 207 Conn. 217, 230-31 (1988)
At the time of trial both parties were 49 years old. Both enjoy good health although the defendant lost sight in one eye during a stressful period in 1985. CT Page 3086
The parties met in their middle school years. They dated in high school and college although they attended separate institutions. The plaintiff obtained her degree from Connecticut College and the defendant from University of Pennsylvania. After they married in 1966, the plaintiff worked as a secretary while the defendant completed his undergraduate degree. He worked for one year before entering the Wharton School of Business in 1968. The plaintiff gave up her job in the fall of 1967 shortly before the birth of the couple's first child, a daughter. Until he completed his course work from Wharton, from which he did not obtain a diploma for some reason, the defendant successfully sold life insurance in the evenings. During this time his parents helped to support the young family. Their second child, a son, was born in 1970.
Upon the completion of his studies at Wharton, the plaintiff joined a management consulting firm in 1970. In 1978 he sought a larger firm and found one in Louisville, Kentucky. He made a franchise proposal to the corporation that allowed him and a partner to open an office in Philadelphia. He was very successful in that operation and the company asked him to take over its Boston area. He commuted mid-week and weekends to New Jersey to see his family, then returned to Boston the next business day. In 1982 the company merged with William M. Mercer, Inc., a wholly owned subsidiary of Marsh McLennan and he was bought out with stock and a two-year payout of the balance due. In 1984, he was put in charge of the New York region and the company provided him with an apartment in New York City. He and the plaintiff decided to postpone a move to New York because their daughter was completing high school. He commuted to New York City for two years. The next few years were extremely stressful for the defendant professionally. As a result he lost the vision in his left eye in 1985. At the time of trial the defendant was managing director of Mercer and earned a base salary of $232,080 per year. In the past he has received bonuses and in 1992 he received $82,500. His 1993 bonus was undetermined at the time of trial.
During all these years the plaintiff devoted her time to raising the children and maintaining the home. She entertained as her husband's career required. In 1969 the parties had purchased a home in Cherry Hill receiving assistance with the down payment from the plaintiff's parents. They returned to Haddonfield three years later. Eventually they found their "dream" home and purchased a Victorian home in Haddonfield. They expended a great deal of time and energy in redecorating and restoring the home. The defendant worked on CT Page 3087 weekends and evenings along with the plaintiff.
In addition, the plaintiff obtained her real estate license in 1980 and the parties purchased three residential properties for investment purposes which the plaintiff managed. The source of funds for these purchases was the defendant's income and stock which they used as collateral for loans. They sold these properties after the 1986 Tax Reform Act curtailed the tax benefits of such ownership. For the three years prior to trial the plaintiff has worked as a decorator in an architectural firm. She earns $29,500 per year.
Until September 1986, when their daughter entered college and their son entered private boarding school, the plaintiff believed the parties enjoyed a good marriage. The defendant, however, had decided, after 1984, that the relationship was not meeting his emotional needs and that his wife was often nasty and angry.
From the time the defendant had moved to the New York City apartment the plaintiff often spent time there. The plaintiff expected that she would move to the city when the children left home and that the Haddonfield property would be sold. The parties discussed having a country home in Connecticut.
On the night they returned to New York from moving their daughter into her freshman dormitory the defendant told the plaintiff he was dissatisfied with the marriage. They separated in January 1987. In May 1987 they reconciled until January, 1988. In May, 1987 at the time of their first reconciliation, the plaintiff found the photograph of a woman in the New York apartment. She asked the defendant if he wanted to tell her about this woman but he declined. He had already denied, in marriage counseling, that he had had other relationships. After his denial, he told the plaintiff that he had had "platonic" relationships with three other women.
After January, 1988, the parties continued to see each other for several times a week. The plaintiff sought a commitment from her husband that he would not see other women but he could not give that commitment. The defendant admitted to the court that he became involved with Margaret Handmacher in 1987 who was an employee of the same Kentucky firm as he and that the relationship continued until January or February of 1989. In December 1989 through early spring of 1990 the plaintiff received three whispered telephone messages from a woman telling her that the defendant was having an affair. These were followed by daily calls wherein CT Page 3088 the caller hung up or left recorded messages. The defendant admitted the affair to the plaintiff but assured her that "the woman meant nothing to him." In December 1989 the plaintiff asked him to leave home. The plaintiff suspected the telephone calls were from Handmacher and the defendant promised he would hire a private detective to investigate. He never showed the plaintiff a bill for services nor any investigator's report, however. He told the plaintiff that the detective's findings were inconclusive.
He filed for divorce in February 1990 while the parties were still dating each other and having marital relations. He withdrew his divorce action and the couple reconciled again in the spring of 1990. At this juncture the defendant told his wife that they should sell the Haddonfield home and buy a home in Connecticut and a New York City apartment. In 1990 the plaintiff attended school studying decorating and moved to one New York City apartment while the defendant lived in another. At this time the plaintiff spent approximately three weeknights and weekends with the defendant and did not believe he was seeing other women.
In 1990 the defendant began to date Joanne Sullivan and in 1991 dated several women. Sullivan resides in Greenwich, Connecticut. Although the defendant told the plaintiff he no longer saw Sullivan, he lent her $5000 in August, 1992.
The parties sought a home in Connecticut, at one point hoping to have an appropriate setting for their daughter's July 1991 wedding. The defendant purchased a home at 296 Center Street, New Canaan for $657,000 in late June 1991 without telling the plaintiff the date of the closing. He moved there in August 1991 from an apartment in Norwalk, to which he had moved, and failed to give her a key to the property. Yet he took the plaintiff and their son on a family vacation to Vermont in August 1991 where their daughter and son-in-law joined them briefly.
In September 1991 the defendant invited the plaintiff to the New Canaan home to attend a function at the Burning Tree Country Club where he had purchased a membership. Before leaving for the function, the plaintiff found photographs of Sullivan. After confronting the defendant with his ongoing infidelities the plaintiff discovered that he had no intention of having her live in New Canaan but wanted her to attend the Country Club function so that he could obtain a family membership and enter as a married man. She filed for divorce in January 1992. CT Page 3089
The parties had more than adequate financial resources throughout their marriage. At the time of the first separation, the parties owned the Haddonfield property. They sold that in December 1990 for $480,000 and paid off the $50,000 mortgage balance. They bought a five-and-one-half room co-op apartment, 9A, at 51 East 90th Street in New York City for $440,000 for which they obtained a mortgage of $300,000. The plaintiff resides there now. It is located between Park and Madison Avenues in the Carnegie Hill section of New York and is near an entrance to Central Park. Its present value is $345,000.
The Connecticut home was purchased for $690,000 and it presently has a mortgage of over $500,000. The home has four fireplaces, a wine cellar, a greenhouse, an in-ground swimming pool and a garage apartment. Its present value is $665,000. The defendant resides there.
The parties historically used collateral to purchase real property and stock. In the last years of the marriage, the defendant collateralized loans to pay living expenses. The court will not receite [recite] the items purchased by the defendant during the last eight years but he spent sums of money for gifts for, and travelling with, his women friends. He purchased the Burning Tree Country Club membership for $25,000 with marital funds knowing that he had no intention of having the plaintiff share its benefits. On a financial statement as of August 1992, he showed gross income of $318,680 for the eight months of 1992 and expenditures of $523,944 of which over $300,000 was used for his own personal expenses.
The most significant financial occurrence was the defendant's purchase of his parents' home on October 31, 1990. His father was dying then and had made application to a retirement village. The parents' home was on the market for $295,000. The defendant decided to purchase the home for $265,000 and took out two mortgages on the property, one from his parents, in the total amount of $280,000. His parents paid the tax on capital gains and bought a car. After his father died in September 1992, his mother inherited approximately $150,000 and entered a nursing home. She has approximately $2000 per month in income. The defendant pays $1300 on her behalf and $1140 to her as payment on the second mortgage. He also pays the first mortgage on the property to the bank. He described himself as a "good son" but it is clear that whatever his intent he used marital assets to provide for his parents without consulting the plaintiff. This house is presently worth $190,000. CT Page 3090
More than the defendant's infidelities, it was the defendant's Janus-faced handling of the marital relationship, the separations and reconciliations, that was the catalyst which caused the breakdown of the marriage. He did not merely lie to the plaintiff but led her to believe that there was hope for their relationship while humiliating her and professing his continued love and regard for her. In fact at trial he professed that she meant everything to him, failing to see the inconsistency between his testimony and his actions over the last eight years. His testimony at trial was sometimes evasive and elusive and at times self-serving in his account of his affairs and his handling of financial matters. For several years the plaintiff clung to the hope that the marriage could be saved. While the court recognizes that both parties must share the responsibility for a deterioration of their relationship, it was the defendant's continued duplicity that prevented the parties' reconciliation.
On December 29, 1993 the parties entered into a stipulation. The court found jurisdiction and entered an order dissolving the marriage of the parties on the grounds of irretrievable breakdown. The stipulation also provided for the filing of 1993 income tax returns and the payment of 1993 income taxes. The terms of the stipulation become the orders of the court and the stipulation is attached hereto and incorporated by reference into the decree.
In addition, the following orders may enter:
A. Alimony
1. The defendant shall pay to the plaintiff the sum of $5666.67 per month as periodic alimony. Said alimony shall be paid during the lifetime of the plaintiff until the defendant's death. Cohabitation pursuant to the statute, the plaintiff's remarriage and the defendant's retirement shall not be grounds for terminating the alimony but may be grounds for its modification based on a substantial change of circumstances.
2. In addition to the foregoing, the defendant shall pay to the plaintiff 20% of his earned income from all sources of employment, including but not limited to, bonuses from stock options.
3. A contingent wage withholding order may enter.
B. Real Property CT Page 3091
1. The plaintiff shall transfer her interest in the New Canaan property to the defendant. He shall be responsible for payment of the mortgage and expenses and hold the plaintiff free from any claim and harmless thereon.
2. The defendant shall transfer his interest in the New York City co-op apartment to the plaintiff. She shall be responsible for payment of the mortgage and expenses and hold the defendant free from any claim and harmless thereon.
3. The defendant shall retain the Haddonfield property free from any claim of the plaintiff.
C. Personal Property
1. The plaintiff shall retain her Smith, Barney account, her Chemical Bank checking account, her interest in the Seaview trust, her IRA and Keough accounts and her Saab automobile as shown on her financial affidavit. If she has an interest in the Tavistock Country Club or Burning Tree Country Clubs she shall assign that interest to the defendant.
2. The defendant shall retain the membership of the Burning Tree Country Club, his antique car, his bank accounts and stock options as shown on his financial affidavit.
3. The defendant shall transfer and assign to the plaintiff his 401K plan and 90% of the value of the marketable securities as that value existed on December 29, 1993. He shall pay the collateral loans to Fleet and Princeton banks to the extent necessary to comply with this order within six months of the date of the decree.
4. The plaintiff shall retain furniture and furnishings which were obtained from her family. The defendant shall retain furniture and furnishings which were obtained by his family. The remaining items of personalty are to be divided equally by the parties. In the event the parties are unable to divide their personal property, they shall submit the issue to the Family Relations Office for mediation. The court shall reserve jurisdiction to resolve any disputes concerning the personal property.
5. At the time of the defendant's retirement, the plaintiff shall be entitled to 62% of the gross value of the CT Page 3092 Defendant's Marsh McLennan pension plans as those values existed on December 30, 1993 by virtue of a Qualified Domestic Relations Order.
D. Life Insurance
1. The defendant shall maintain life insurance in the amount of $400,000 for the benefit of the plaintiff until he is no longer obligated to provide alimony.
E. Liabilities
1. The plaintiff shall be responsible for paying those obligations which appear on her financial affidavit and she shall hold the defendant free of any claim and harmless thereon.
2. The defendant shall be responsible for paying those obligations which appear on his financial affidavit and he shall hold the plaintiff free af [of] any claim and harmless thereon.
F. Counsel Fees
1. The defendant shall pay the sum of $15,000 toward the plaintiff's counsel fees within 180 days of this judgment.
G. Income Taxes
1. The parties shall file their income tax returns and share a refund as agreed in the stipulation attached hereto and made a part hereof.
All other claims for relief not expressly addressed herein have been rejected.
Judgment may enter accordingly.
The court commends counsel for a clear presentation of the evidence.
Leheny, J.